OLSON MANFG. CO. *v.* REX MOTOR CO.

1. CORPORATIONS—CREDITORS' SUIT—MORTGAGES—VALIDITY.

On appeal by judgment creditors of a motor corporation from a decree sustaining the validity of mortgages covering the real and personal property of said corporation, evidence *held*, sufficient to sustain the decree of the court below.

2. SAME—STOCKHOLDERS—PART PAYMENT FOR STOCK — LIABILITY FOR DEBTS.

Where the incorporators of a motor corporation subscribed for a certain amount of its capital stock, part of which was issued and paid for, and later more stock was issued to one of them who divided it among the others, the consideration for which is not clearly explained, said stockholders are liable to the creditors of the corporation for the unpaid balance of stock subscribed for; there being no evidence of any agreement to pay for said stock by services or otherwise.

3. SAME—SEVERAL OBLIGATION.

The obligation of a subscriber to pay for stock is a several obligation, which may not be diminished because some other delinquent subscriber cannot respond or cannot be brought within the jurisdiction of the court.

Cross-appeals from Wayne; Lamb, J., presiding. Submitted June 6, 1918. (Docket No. 57.) Decided December 27, 1918.

Judgment creditors' bill by the Olson Manufacturing Company and another against the Rex Motor Company, Charles H. Riopelle, and others. From the decree rendered, plaintiffs and defendant Riopelle appeal. Modified, and affirmed.

*Frederick E. McCain (Stevenson, Carpenter, Butzel & Backus, and William S. McDowell, of counsel),* for plaintiff Olson Manufacturing Co.

*Ignatius J. Salliotte* (*James O. Murfin,* of counsel), for defendants Riopelle.

OSTRANDER, C. J.    This is a proceeding instituted by judgment creditors of the Rex Motor Company, who have made said company and Charles H. Riopelle, Eliza J. Riopelle, his wife, William J. Frasier, Alfred Robinson, and Frank Lemerise defendants.    The company was incorporated in December, 1913, with an authorized capital of $75,000, with 7,500 shares.    The declared purpose of the corporation was to manufacture, buy, sell, and deal with automobiles, automobile motors, transmissions, etc., and to carry on a general manufacturing and mercantile business at Ford, Wayne county, Michigan.    Some, perhaps all, of the original incorporators had become interested in an attempt to develop and apply what appears to have been a novel idea in motor cars—a front wheel drive—and before the incorporation of the Rex Motor Company had spent some time, perhaps a little money, in this behalf.    They capitalized their optimism, some labor, a little property and credit.    At the hearing, one of them testified that—

"The blue prints of the front wheel drive and the blue prints of the motor are all that is left of the assets of the company for the general creditors now."

The same witness testified further:

"There was considerable experimental work done on this motor prior to the incorporation of the company by Mr. Blumstrom, Mr. Frasier and Mr. Lemerise. Before the organization we got together and planned for a factory site, and started to get material for building.    We started the latter part of October, 1913, and prior to the time of incorporation I worked with the carpenters getting the material and getting the stuff on the ground.    Mr. Lemerise, Mr. Frasier, Mr. Robinson and Mr. Blumstrom also did the same work. They had drafted designs for the engine and the motor

prior to the time of the incorporation and the five of us continued in this experimental work after the incorporation."

Of the capital stock, one-half, or $37,500, was subscribed by Riopelle, Frasier, Lemerise, Robinson, and Charles H. Blumstrom, in equal amounts. None of them paid in any cash, but Frasier, Robinson, Blumstrom, and Lemerise contributed certain personal property valued at $8,090, and Charles H. Riopelle contributed a parcel of real estate valued at $4,500. The personal property was later on mortgaged to Frasier, who assigned to another, not a party here; the mortgage was foreclosed and the property sold. The real estate was mortgaged to Mrs. Riopelle for $6,500, and her mortgage has been foreclosed.

It is a contention of the plaintiff creditors that as to them and other creditors these mortgages were void, and that the court should so declare and treat the property, real and personal, as assets of the company for their benefit. This contention the court determined adversely to them, and upon a review of the testimony, which will not be set out here, we decline to disturb the judgment of the trial court. It may, however, be said, in this connection, that the person who has apparent title to the personal property is not brought upon the record, that it is clear that Mrs. Riopelle advanced the money represented by her mortgage, that the corporation had the benefit of it, and that she is not shown to have participated in any purpose, if her husband and other shareholders had the purpose, to cover up assets of the company in fraud of creditors.

It is a further contention of plaintiff that some of these defendants should pay for the stock they subscribed for for the benefit of creditors of the company, and the court, being of this opinion, found that there is due from Charles H. Riopelle upon his original subscription $3,000. As he had purchased the

stock and interest of Alfred Robinson, the further sum
of $5,480 was found to be due from him on that account, and, as he had also purchased the stock of
Frank Lemerise, the sum of $5,470 was found to be
due from him on that account—the total of these being
$13,950. It was found that William J. Frasier is indebted to the company upon his stock subscription
$5,480. The court also found there is due to certain
judgment creditors of the Rex Motor Company—to
Olson Manufacturing Company, $5,223.21, to Swope-
McCracken Company, $68.18, to Advance Pattern
Works, $309.25, to Knott & Jarlus Company, $158.01,
exclusive of interest and costs in each case. As to
defendants Robinson, Lemerise, and Mrs. Riopelle, the
bill is dismissed. Defendants Charles H. Riopelle and
William J. Frasier are ordered to pay plaintiffs' claims
"in proportion to the amount of their indebtedness
to the Rex Motor Company as herein set forth,"
together with the costs of suit. Eliza J. Riopelle is
given costs in the sum of $20. The bill was taken as
confessed by defendant Frasier. Defendant Charles H.
Riopelle and plaintiff Olson Manufacturing Company
appeal from the decree.

Riopelle's contention, briefly stated, is, that on the
admitted facts liability for unpaid subscriptions to the
capital stock cannot attach.

The court accepted the recitals in the articles of association as to what was in the first instance contributed by the associates, giving appellant credit for
$4,500 for his real estate and Frasier, Robinson, Blumstrom and Lemerise credit each for one-fourth of the
value of the personal property contributed. This personal property consisted of—

"Mahogany patterns for the manufacture of motor
and transmission covering the entire construction of
motor and transmission, all being located at 268 Junction avenue, Detroit, $2,250; one 14½ h. p. sample

and model motor and transmission now in operation and located at 268 Junction avenue, $2,350; drawings, tracings and blue prints covering all designs relating to the construction of motor and transmission, same being located at 268 Junction avenue, $2,800.00; tools and jigs located at 268 Junction avenue, $690; total valuation of which said property is taken, $8,090.00."

The incorporators never paid in anything more. What they did of record, is evidenced by the following:

"A special directors' meeting, village of Ford, Michigan, August 31, 1914. Special directors' meeting called by the president for the purpose of allotting stock to the five incorporators in the sum of $20,000 for their services in completing the Rex Front Wheel Drive. Moved by Frank Lemerise, that the 20,000 stock be issued to Charles H. Blumstrom and in return have same assigned over to William F. Frasier, $4,000; Charles H. Riopelle, $12,000 worth; $4,000, Alfred Robinson to C. H. Riopelle; $4,000, Frank Lemerise to Harry Riopelle; balance, $4,000, to Charles H. Riopelle's shares in said front wheel and friction motor drive automobile known as Rex Friction Front Wheel Drive. Supported by Charles H. Blumstrom, Lemerise, Frasier, and Riopelle, carried unanimously."

Concerning this, Mr. Riopelle testified:

"My own share according to that was $4,000. I think it was paid for in services, time and money expended since the date of incorporation. We credited up this stock $20,000 and reported it as additional value of patents and so forth. I had turned in real estate to the value of $4,500, which left $3,000 according to the books. I got $4,000 in value here in stock. I did not charge up to the company the $1,000 difference because I thought the stock was good. It was all right at that time in August, 1914. That was the same month we put a mortgage on the property to pay a note and our other little indebtedness. This company had never received any cash other than about $4,000 from these small stockholders. That was all the cash that the company had. What Lemerise, Blumstrom and Robinson collected; it didn't go through my hands. We never had six machines running at a time.

We never had but one.   On August 31, 1914, we owed the bank $5,000 on a note and other indebtedness of about $1,500.   We had about 82c in the bank at the time."

He also testified, referring to the $20,000 stock allotment:

"Q. What was the object of that?

"A. That was for our work and time and one thing and another and money expended in organizing the concern and extra pay.   That was the understanding when we first organized.   I don't know why we issued it all to him at first.   He promised us he would return us $4,000 each.   I couldn't tell you exactly what his promises had to do with it.   That was the understanding at that time and before.   The applications for the patents and everything were in his name.   He signed them over to the company at that time and we issued all the stock to him in payment therefor.   He did not make us a present of that stock.   That was our proportion of the money advanced, our time and expenses.   I advanced my expenses on the road right along.   You will not find any expense account of mine in that book.

"The money that Blumstrom used to go to Chicago was company money.   That was for the Exhibit 4, or $500.

"I paid my own fare, paid my own bills, and they paid their expenses on the road every day; car fare, traveling around, and expenses on the road, trying to sell stock.   That was expenses trying to sell this stock. My expenses are not credited on my personal account. The $20,000 stock is just recompense for our time and expense.   I spent more money beyond what is on the books.   It cost me $5 or $6 a day on the road every day.   I went all around, machine shops here and there, stopped in this place and that place, in Detroit, Ecorse, and different places.   I went to Monroe and Mt. Clemens and around testing these automobiles.   We had employees at our place who sometimes did testing. My son did the testing on one car.   I ran one car. We wanted to advertise the car so as to get the car on the market in Wayne county.   We didn't want to go out of Wayne county until we got started.   Altogether we had 4 or 5 cars.   Blumstrom, Robinson and

Frasier were the originators of this car. Blumstrom and Robinson were the inventors. We issued the $20,-000 worth of stock to Blumstrom for the patents, designs, on this car, labor, etc. We all got a division of that $20,000 from Blumstrom by pre-agreement."

And:

"*Q.* * * * 'Moved by Frank Lemerise that $20,-000 stock be equalized between the five stockholders. Carried.' What did you mean by that?

"*A.* By equalize I mean divided by five. I did not need $4,000 to equalize my subscription. I wanted all the stock I could get. With the exception of the $590 stock that was issued out of the treasury, there has been but $37,500 worth of stock issued all together. We never entered upon that subscription account other subscription which we had to the company for stock. I think we had some corporation by-laws. I couldn't tell you where they are. The directors had authority by the by-laws to place a chattel mortgage on the machinery and a mortgage on the property. We had by-laws, but I don't know where they are. In the case of Rundy we enforced the subscription to the stock of the company in court in behalf of the company. It is not on Exhibit B, the subscription account. On the subscription account are entered just the five original subscriptions, and we used Rundy's subscription and all the rest to balance these figures. If we had put all these subscriptions on the subscription account, there would have been a balance due there of some $24,000. The money paid that was received from the other stockholders and the $20,000 which we voted to ourselves balanced that account.

"*Q.* Now, there, all the money which was expended by you and Lemerise and from Frasier and from Blumstrom in going to Chicago and in experimenting with this car, and all the different things trying to develop this car, they drew back again, didn't they, at different times from the company?

"*A.* They drew back after we organized, they drew back what money they paid out.

"*Q.* And after you organized, they put in bills and drew it back from time to time?

"*A.* Sure; yes, sir.

"*Q.* Then for this $20,000 you furnished the company simply your services in soliciting and showing off this car to various people around in Wayne county, and your knowledge, whatever it happened to be, in regard to motors?

"*A.* Yes, me and the rest of the boys."

What stock was this, thus voted by the directors to themselves? The minutes do not purport to authorize a credit to these gentlemen upon their stock subscriptions. It is a vote of stock, to be issued and divided. .

About this, defendant Robinson testified:

"*Q.* What do you know about this $20,000 dividend divided between the other gentlemen in August?

"*A.* I think it was something about $20,000 to be divided up for charges that we had to make.

"*Q.* Was that new stock in the company?

"*A.* I think so.

"*Q.* Was that new stock over and above $7,500?

"*A.* Yes, Blumstrom gave us that.

"I couldn't tell you whether it was to be new stock over and above the original incorporation or to be used in payment of old stock. I never understood it. I don't know when this was first spoken of. I do not now claim any portion of that $20,000. I sold all my rights, that I had connected with this concern to Mr. Riopelle. I understood this $20,000 was to be for changes."

And defendant Lemerise testified:

"I agreed to take 750 shares, but we didn't intend to sell any more than we had to. We put in all the money that we had, then we finally ran out and had to sell stock in order to keep going. I put in lots of money, but I did not keep an account of the amounts that I put into this company. I drew out some money. I didn't keep account of my expenses in behalf of the company. I didn't get half of what I ought to have got for the work I did and the money that I put in. I did not keep track of the amount of money I put in. I presented to the company expense bills for the trip to the automobile show and a couple of tires, $198.92. We didn't get anything for our work. We didn't draw

any salary out of it.   There wasn't any salary author-
ized to me.   I don't think there was to Mr. Riopelle.   I
don't know anything about the books.   I sold my stock
to Mr. Riopelle for $1,000, 750 shares.   I don't know
whether I had any other stock or not.   Later on we
voted ourselves $20,000.   I guess it was in addition to
$7,500.   I think that was $20,000 we raised when we
put up the new car.   That was included in the $7,500
I subscribed.   We did not get any additional certifi-
cates.   I don't know why this $20,000 was voted to Mr.
Blumstrom entirely.   It was too long ago.   It is my
signature to Exhibit A-17.   At the bottom of that
certificate.   That was voted for the automobile front
wheel drive.   I can't recall why it was issued to Mr.
Blumstrom first.   I couldn't tell you why that particu-
lar transaction took place in that way.   I did not get
certificates for my portion of that $20,000.   That was
to complete the front wheel drive.   Mr. Blumstrom
set the figure at $20,000.   I don't remember whether
I was present at all these meetings.   That was paid
by our services in completing this front wheel drive."

Defendant Frasier, to whom the chattel mortgage
was given, testified:

"The $20,000 was not in addition to the $7,500
which we subscribed.   The $20,000 was to pay that
subscription.   I was present at the meeting, the
minutes of which are shown on Exhibit A-17, where
this stock is voted.   It was voted to Blumstrom be-
cause we had our deal with Blumstrom, he was given
$20,000 for his invention, his labor, his services ren-
dered, his management and so on.   He was the gen-
eral manager and inventor of the machine and ran
the factory.   I bought that stock of Blumstrom after-
wards.   It was a bargain between us and him for so
much and to take it in stock.   I paid him $1 and other
considerations and we paid a good many other dollars
too.   I bought that stock of Blumstrom and the others
did the same.

"Q. And some of it, a big portion of it went to Mr.
Riopelle, didn't it?

"A. What Mr. Riopelle bought and Lemerise bought
and Robinson's direct from them.

"Q. When was this bargain made?

"*A.* When we first opened up there started the company, that was the bargain made between Blumstrom and the bunch, when we got the thing going good started in once, to get $20,000 for his inventions and the stuff that he had in looking after the thing. He was to draw no salary until the thing was complete. He just got $25, $50 and so on to live on. He got money from me and from Lemerise and from all of us. He still owes us for that money. On August the 3d we got going and voted this stock to him. He made demand because he had the thing perfected, and he transferred everything to the company. At the time of the incorporation the Rex Motor front drive was in the experimental stage; it was developed in a way and in an experimental way, and then we showed the first car in Chicago. Then when we came back they had to change this and they have been changing ever since. You can call it an automobile, call it complete as far as it is, and where it is, but for a perfect thing it never has been.

"*Q.* When you subscribed for 750 shares of stock you expected to pay for it? You understood that was a debt to the company?

"*A.* That was the understanding between Blumstrom and us at our first agreement, our first arrangements.

"I put in money at the time of the incorporation. Mine was all cash. It was money put into the company as they went along before the incorporation. That was the same as cash put in at the incorporation.

"*Q.* How did the voting to Blumstrom of $20,000 pay your debt on this subscription?

"*A.* Why, we canceled—it was voted to me then canceled off from my account to the company.

"*Q.* $4,000?

"*A.* Yes.

"*Q.* We are talking about the time of incorporation in December, 1913, there was $8,090 worth of property put in.

"*A.* Yes.

"*Q.* Of which you got a quarter, that was $2,020, wasn't it?

"*A.* Yes, sir.

"*Q.* That left $5,480 still due?

"*A.* Yes.

"*Q.* How did the voting to Blumstrom of $20,000 pay your debt to the company on this subscription?

"*A.* Why we canceled—it was voted to me then canceled off from my account to the company bank?

"*Q.* $4,000?

"*A.* Yes.

"*Q.* Where did the balance of $1,480 come from?

"*A.* I don't know."

Here is some evidence of confusion, but no evidence of payment for the stock subscribed for by the incorporators. Some of this testimony tends to prove an arrangement or agreement to aid Mr. Blumstrom, the inventor, in perfecting a car, in creating something for which there would be a demand, a salable thing, and when it was completed, with a going corporation behind it, stock was to be issued to Blumstrom for his invention, etc. But nothing of value was completed, and it does not appear that anything of value was by Blumstrom turned over to the corporation. It does not appear that there were any patents. What appears to have been attempted was to make use of the alleged Blumstrom agreement to relieve the original subscribers to stock of their liability to pay for the same. Assuming that stock of a corporation may be issued for property and for services in good faith performed for the corporation—that it can pay a debt for services with stock as well as with money—and assuming further, what is not, however, proven, that Blumstrom had earned $20,000 of capital stock, it is not perceived how the issue of stock to him would affect the subscription of others to whom he may have transferred some of his stock. It would increase their holdings, it could not pay their debt to the company. And if the stock was not voted to Blumstrom according to the theory that he had earned it, that it paid him what the company owed him, then he had no right to it at all. There is no reasonable theory according to which a vote of stock to Blumstrom and a

transfer of it by him to appellant could pay appellant's debt to the company, even if Blumstrom was a mere figurehead, a mere conduit.

No demands of these incorporators for services were ever allowed by the corporation. There is no evidence of any arrangement, any contract, to give their services to the corporation in payment for its capital stock. After the fact, the directors sought to dispose of all equitable, as they had theretofore disposed, or did soon thereafter dispose, of all physical, assets of this corporation, relieving themselves of the obligations of their respective contracts to pay for the stock they had subscribed for. We know of no adjudicated case and of no principle of law which will sustain appellant Riopelle's contention.

In one respect, the decree appealed from is wrong and ought to be modified. The obligation of a subscriber to pay for stock is a several obligation. See 3 Comp. Laws 1915, § 13596; 4 Thompson on Corporations (2d Ed.), § 5044; *Dieterle* v. *Paint & Enamel Co.*, 143 Mich. 416. Each demand, against each subscriber, is an asset of the corporation, which may not be diminished because some other delinquent subscriber cannot respond or cannot be brought within the jurisdiction of the court. Creditors of the corporation may in this proceeding look to each of them for payment. The ninth paragraph of the decree will be amended by striking out the words "in proportion," and as so amended the decree will be affirmed.

Defendant Eliza J. Riopelle will recover her costs of this appeal from the plaintiff, appellant. No other costs are allowed.

BIRD, MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.